IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

EDWARDO G. CHAPALET,
     Petitioner,

vs.                             Case No.:  5:14cv113/MW/EMT

SECRETARY FLORIDA DEPARTMENT
OF CORRECTIONS,
     Respondent.
_____/

## SECOND REPORT AND RECOMMENDATION

On January 5, 2016, the undersigned issued a Report and Recommendation (ECF No. 43), recommending that Respondent's motion to dismiss (ECF No. 32) the amended habeas petition be granted, based upon Petitioner Chapalet's failure to timely commence this § 2254 action.  In recommending dismissal of the amended § 2254 petition, the undersigned concluded, in relevant part, that Chapalet failed to carry his burden of establishing his entitlement to equitable tolling (*see* ECF No. 43).  On March 15, 2016, after considering Chapalet's objections to the Report and Recommendation (ECF No. 46), the District Judge rejected the Report and Recommendation in part and recommitted the matter to the undersigned to conduct an evidentiary hearing on Respondent's motion to dismiss and submit a second report and recommendation (ECF No. 47).  The undersigned then appointed counsel to

represent Chapalet at the evidentiary hearing (ECF No. 52), which was held on July 23, 2016, in Panama City (*see* ECF Nos. 61, 63).  After careful consideration of the record and the evidence adduced at the evidentiary hearing, it remains the opinion of the undersigned that Respondent's motion to dismiss should be granted.

I.      DOCUMENTARY EVIDENCE IN THE RECORD

The record of the state court proceedings concerning Chapalet's criminal conviction, and of many of the written communications between Chapalet and Attorney Rudolph ("Rusty") Shepard during Shepard's representation of Chapalet, was set forth in detail in the first Report and Recommendation (ECF No. 43).[1]  The undersigned repeats that record here for purposes of completeness.  Incorporated into this section are seven additional written communications from Chapalet to Shepard, which were submitted at the evidentiary hearing (*see* ECF No. 61).

Following a jury trial in the Circuit Court in and for Bay County, Florida, Case No. 2006-CF-2907, Chapalet was found guilty of one count of extortion and one count of misdemeanor battery (ECF No. 32-1, Ex. A at 45–46, Ex. B, Ex. D).[2]  On April 3,

---

[1] The District Judge granted expansion of the record in this case to include the written communications between Chapalet and Attorney Shepard, which Chapalet submitted in response to Respondent's motion to dismiss (*see* ECF Nos. 40, 47).

[2] All citations to the state court record refer to the exhibits submitted with Respondent's motion to dismiss (ECF No. 32).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.  All page references to documents which are not part of the state

2007, he was sentenced as a habitual felony offender ("HFO") to fifteen years in prison on the extortion count, with pre-sentence jail credit of 225 days, and time served on the battery count (ECF No 32-1, Ex. A at 55–61, Ex. C).

Chapalet's court-appointed counsel filed a notice of appeal on May 2, 2007 (ECF No. 32-1, Ex. A at 71).  The Florida First District Court of Appeal ("First DCA") assigned Case No. 1D07-2455 (ECF No. 32-1, Ex. PD-2).  On May 28, 2007, Chapalet wrote a letter to Attorney Shepard informing him that his (Chapalet's) mother had funds to retain Shepard, and identifying several issues which he believed should be raised on direct appeal (ECF No. 40 at 20).  On June 27, 2007, Shepard filed a notice of appearance in the trial court and the First DCA (ECF No. 32-1, Ex. PD-2, Ex. A at 99).

On July 9, 2007, Chapalet again wrote Shepard a letter identifying issues that he believed should be raised on direct appeal (ECF No. 40 at 27).  In another letter dated the same day, Chapalet asked whether Shepard had received his previous letter, and stated that he had many questions and issues to discuss with Shepard concerning his case (*id.* at 26).  On July 24, 2007, Shepard sent a letter to Chapalet at the Collier County Jail stating the following:

court record reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

Case No.:  5:14cv113/MW/EMT

I am in receipt of your correspondence dated July 9, 2007.  As you know, I have been retained by your mother, Florence Bennett, to represent you in the direct appeal in the above referenced matter.  The record on appeal was completed on July 17, 2007.  I have 30 days from that date to file my initial brief with the First District Court of Appeal in this case.

The appeal that I am handling is a direct appeal, which deals with controversial issues and decisions made by the trial judge in your case.  As I am reviewing the trial transcripts, I also have a number of factual questions and wonder why Mr. Alldredge [Chapalet's trial counsel] made some of the decisions he made in this case.  The particular appeal that we are required to handle first is the direct appeal dealing with issues brought up by the judge.  Upon completion of the direct appeal, we can go back and question the decisions made by Mr. Alldredge in a Rule 3.850 Motion for Ineffective Assistance of Counsel.  I have not yet been retained for that appeal, nor can the Rule 3.850 appeal be made until after the direct appeal is completed.  I will do my best to track you down in the Department of Corrections so that I can talk to you via telephone about what is going on with your case.

I am requesting that you write to me as soon as possible to tell me your most current address, additionally, please feel free to include any questions that you have.

(ECF No. 40 at 11) (emphases added).

On August 13, 2007, Shepard filed a motion for extension of time to file an initial brief in the direct appeal (ECF No. 32-1, Ex. PD-2).  The First DCA granted the motion (*id.*).  On August 26, 2007, Chapalet wrote Shepard a letter asking whether Shepard had received the "paperwork" he had sent "about 3 months ago," and asking Shepard to send trial transcripts and advise him as to Shepard's assessment of the

direct appeal (ECF No. 40 at 28).   Chapalet notified Shepard that he had been transferred to the South Florida Reception Center (*id.*).

On September 26, 2007, Shepard filed another motion for extension of time to file an initial brief, which the First DCA granted (ECF No. 32-1, Ex. PD-2).

On December 10, 2007, Shepard filed an <u>Anders</u> brief (ECF No. 32-1, Ex. PD-2).  Shepard also filed a motion to withdraw from representing Chapalet on direct appeal; however, the motion apparently did not include a certificate of service indicating that it had been served upon Chapalet (*see id.*).  On December 13, 2007, the First DCA denied the motion to withdraw without prejudice to Shepard's filing an amended motion which stated Chapalet's address and showed that a copy of the motion was served upon Chapalet (*id.*).   On December 21, 2007, Shepard filed an amended motion to withdraw (*id.*).   On December 26, 2007, Chapalet sent Shepard a letter from Century Correctional Institution, acknowledging that he received a copy of the amended motion to withdraw, and asking why Shepard was withdrawing (ECF No. 40 at 46).

On January 8, 2008, the First DCA denied Shepard's motion to withdraw, citing <u>Payne v. State</u>, 589 So. 2d 1037 (Fla. 1st DCA 1991), in which the First DCA suggested that the proper procedure when an attorney files an <u>Anders</u> brief on behalf of a client is for counsel to file a separate motion seeking leave for the client to file a

pro se initial brief (ECF No. 32-1, Ex. PD-2).  Despite having denied Shepard's motion to withdraw, the First DCA set a 30-day deadline for Chapalet to file a pro se initial brief (*id.*).

On February 14, 2008, Chapalet wrote Shepard a letter referencing "our last telephone conversation," thus indicating that the two had recently spoken (ECF No. 40 at 35–36).  Chapalet inquired as to the status of the direct appeal, and identified three issues of trial court error which he believed were meritorious (*id.*).  On February 26, 2008, Shepard filed a motion to allow Chapalet to file a pro se initial brief (*id.*).

On March 10, 2008, Chapalet wrote a letter to Shepard listing issues he believed were meritorious for his direct appeal and a 3.850 motion (ECF No. 40 at 42–44).  Also on that date, the First DCA issued an order directing Shepard to show cause, within 10 days, why the initial <u>Anders</u> brief should not be stricken with leave to amend due to deficiencies in the initial brief (ECF No. 32-1, Ex. PD-2).[3]

On April 3, 2008, the First DCA issued an order striking the initial <u>Anders</u> brief and extending the deadline for Shepard to file an amended brief to April 23, 2008 (ECF No. 32-1, Ex. PD-2).  On April 22, 2008, Chapalet wrote a letter to Shepard requesting that Shepard contact him (ECF No. 40 at 47).  On April 23, 2008,  Shepard

---

[3] The First DCA's docket sheet indicates that Shepard's <u>Anders</u> brief failed to comply with Florida's appellate rules because it did not describe the evidence heard in the trial court, with citations to the record (*see* ECF No. 32-1, Ex. PD-2).

filed an amended <u>Anders</u> brief (ECF No. 32-1, Ex. PD-2).   On April 28, 2008,
Chapalet wrote a letter to Shepard requesting that he schedule a telephone conference
with him (ECF No. 40 at 48).   Also on that date, the First DCA issued order directing
Shepard to correct deficiencies in the amended <u>Anders</u> brief within 10 days (ECF No.
32-1, Ex. PD-2).[4]

On May 7, 2008, Shepard filed a second amended <u>Anders</u> brief (ECF No. 32-1,
Ex. PD-2).   On May 16, 2008, the First DCA issued an order directing Shepard to
correct deficiencies in the second amended brief within 10 days (*id.*).   On May 22,
2008, Chapalet wrote to Shepard acknowledging that he had received documents from
Shepard's office (ECF No. 40 at 40).   On May 28, 2008, Shepard filed a third
amended <u>Anders</u> brief (ECF No. 32-1, Ex. PD-2, Ex. E).

On June 3, 2008, Chapalet wrote a letter to Shepard inquiring if he should file
a pro se initial brief in light of Shepard's filing an <u>Anders</u> brief (ECF No. 40 at
61–62).   On June 12, 2008, Chapalet wrote another letter to Shepard acknowledging
that he had just received mail from Shepard's law firm stamped May 28, 2008 (ECF
No. 40 at 37).   Chapalet stated he "discovered some serious issues I know you can use
on my 3.850 motion," and asked Shepard to review the issues and schedule a

---

[4] The First DCA's docket sheet indicates that the amended <u>Anders</u> brief failed to comply with
Florida's appellate rules because the table of contents did not list the issues for review or summary
of the argument (*see* ECF No. 32-1, Ex. PD-2).

telephone conference (*id.*).  On June 18, 2008, Shepard filed an amended motion to withdraw in the First DCA (ECF No. 32-1, Ex. PD-2).  On June 26, 2008, Chapalet wrote Shepard a letter stating that he had not received any response to his letters (even though Shepard had communicated with him in writing the previous month) and requesting that Shepard contact him (ECF No. 40 at 38).

On July 9, 2008, the First DCA again denied Shepard's motion to withdraw, citing <u>Payne</u> (ECF No. 32-1, Ex. PD-2).

On August 3, 2008, Chapalet wrote a letter to Shepard, asking if he had received his letters and requesting that Shepard schedule a telephone conference (ECF No. 40 at 41).  On August 5, 2008, Shepard wrote Chapalet a letter at Century Correctional Institution stating the following:

> As you may know, I have been trying to set up a telephone conference with you since July 2 of this year.  My understanding from your classification officer is that you have been placed in disciplinary confinement, and cannot be brought to the telephone to speak with me.
>
> As we have spoken of numerous times previously, I have filed an Anders Brief in your case.  What that means is that after reviewing your case I could not find any justiciable issues to bring before the Court.  As I have already advised you, you have the opportunity to file a brief in proper person with the First District Court of Appeal regarding any issues you feel I may have overlooked.
>
> Further, <u>as we have also discussed, your mother retained me to explore a direct appeal on your behalf</u>.  The direct appeal does not appear to have merit.  That is to say after research and review I do not feel the judge made any reversible errors in your case.  However, I do believe

that your attorney made errors in affirmatively advising you that the State could not change the Information filed in your case after a Speedy Trial Demand had been filed. Secondly, I feel that your attorney may have been deficient in his preparation of the case and of you as a potential witness in your Trial. <u>Once the District Court of Appeal has disposed of the direct appeal in your case</u>, I feel the best course of action for us to pursue would be a Rule 3.850 Motion for Ineffective Assistance of Counsel.

I look forward to talking with you over the telephone when your administrative confinement is complete.  In the alternative, I will be happy to correspond with you via U.S. Mail, and you may feel free to contact me with any further questions or comments that you may have.

(ECF No. 40 at 12) (emphasis added).  On August 10, 2008, Chapalet wrote to

Shepard acknowledging receipt of Shepard's August 5 letter, and asking Shepard

when he could "get this 3.850 motion on the road" (ECF No. 40 at 45).

On September 30, 2008, Chapalet wrote to Shepard requesting that he set up a

telephone consultation for October 3, 2008 (ECF No. 40 at 32).  He also asked

Shepard if he was ready to file the 3.850 motion (*id.*).  The copy of the letter from

Shepard's file contains a notation dated October 2, 2008:  "Per Rusty schedule

something for next week." (*id.*).

On October 20, 2008, Chapalet wrote to Shepard requesting that Shepard call

his classification officer and set up a telephone conference for October 24, 2008 (ECF

No. 61-1, Ex. 1-A).  Chapalet asked if Shepard had received his previous letter (*id.*).

Chapalet stated that he had not had a telephone conference with Shepard in over 8 months, and that he had questions to ask Shepard (*id.*).

On October 28, 2008, Chapalet wrote to Shepard stating that he waited in his classification officer's office for 15 minutes for the telephone conference that was scheduled for 10:30 a.m., but no one called (ECF No. 40 at 33).  He asked Shepard to set up another telephone conference (*id.*).

On January 20, 2009, the First DCA issued an order directing Shepard to file a supplemental certificate of service within 10 days indicating that Shepard had served Chapalet with a copy of the third amended <u>Anders</u> brief and motion to allow Chapalet to file a pro se brief (ECF No. 32-1, Ex. E).  On January 27, 2009, Shepard filed an amended motion to allow Chapalet to file a pro se brief, which included a certificate of service stating that a copy of the motion had been served upon the State (*see* ECF No. 32-1, Ex. PD-2, Ex. E).

On February 23, 2009, the First DCA issued an order directing Shepard to show cause, within 10 days, why sanctions should not be imposed against him personally for failing to comply with the January 20, 2009 order (ECF No. 32-1, Ex. PD-2).

On March 4, 2009, Shepard filed a response to the show cause order and a motion to withdraw (ECF No. 32-1, Ex. PD-2).  On March 6, 2009, the First DCA discharged the show cause order and granted Chapalet until March 30, 2009, to file

a pro se initial brief (*id.*).  The court advised that the case would be decided without the benefit of the pro se brief if the brief was not timely filed (*id.*).  On March 8, 2009, Chapalet wrote to Shepard stating that his mother had been trying to contact Shepard for the previous three months, but could not reach him (ECF No. 40 at 65).  Chapalet requested that Shepard contact his mother (*id.*).  On March 23, 2009, the First DCA again denied Shepard's motion to withdraw, citing <u>Payne</u> (ECF No. 32-1, Ex. PD-2), even though the court had set a deadline for Chapalet to file a pro se initial brief.

On May 4, 2009, Chapalet wrote to Shepard stating that he had been released from administrative confinement three weeks prior, and requested that Shepard schedule a telephone conference to update him on the status of the direct appeal (ECF No. 40 at 39)

On July 16, 2009, the First DCA affirmed the judgment of conviction per curiam without written opinion (ECF No. 32-1, Ex. F).  <u>Chapalet v. State</u>, 13 So. 3d 1058 (Fla. 1st DCA 2009).  The next day, July 17, 2009, Chapalet wrote Shepard a letter requesting the status of the direct appeal, and inquiring as to whether Shepard had filed a Rule 3.850 motion yet (ECF No. 40 at 64).

The First DCA issued the mandate in the direct appeal on August 27, 2009 (*id.*).

On September 1, 2009, Chapalet wrote to Shepard notifying him that he had been transferred from Century Correctional Institution to Graceville Correctional Facility (ECF No. 40 at 34).  Chapalet stated that he received a letter from the First DCA, and asked that Shepard explain the letter to him (*id.*).  Chapalet asked whether Shepard had filed the 3.850 motion yet (*id.*).

On October 23, 2009, Chapalet wrote to Shepard advising him that he was no longer in restrictive confinement (ECF No. 61-1, Ex. 1).  Chapalet requested that Shepard contact him, because he had questions regarding his Rule 3.850 motion (*id.*).  Chapalet also requested that Shepard send him the trial transcripts (*id.*).  Chapalet indicated that he had been in the law library researching his case, but needed the trial transcripts because he did not remember everything that occurred at trial (*id.*).  Chapalet stated that his sister told him that she had talked to Shepard on the telephone (*id.*).

In December of 2009, Shepard and Chapalet had a telephone conference.[5]

On January 29, 2010, Chapalet wrote to Shepard stating that his family had been attempting to contact Shepard, but "it seems you been very busy lately" (ECF No. 40 at 24).  Chapalet reminded Shepard that the previous month (December of

---

[5] Chapalet referenced the conference in subsequent letters.

2009), Shepard had told him that he would visit him after the holidays to review the 3.850 motion, and he asked Shepard to contact him (*id.*).

On March 10, 2010, Chapalet wrote to Shepard and reminded him that Shepard had told him in December of 2009, that he would visit him after the holidays so they could review the 3.850 motion before Shepard filed it (ECF No. 40 at 19).  Chapalet inquired as to the status of the Rule 3.850 motion (*id.*).

In August of 2010, Chapalet requested assistance from The Florida Bar regarding Shepard's failure to communicate with him (*see* ECF No. 24-1, Ex. 1).  On August 22, 2010, Chapalet wrote to Shepard asking why Shepard had not contacted him (ECF No. 40 at 25).  He stated that his family was "still calling" Shepard's office, but Shepard's secretary was "giving [them] the run around" (*id.*).  Chapalet asked Shepard to send him the trial transcripts, the prosecutor's file, and written statements of one of the witnesses (*id.*).  He stated, "I appreciate if you could send me all of the above so I can research my own case instead of waiting on you (too much time has pass [sic] already with nothing done)! . . .  Ain't no telling [sic] how much time I have left on my appeal." (*id.*).  On August 26, 2010, Shepard had a telephone conference with Chapalet, as indicated in a letter from Chapalet to Shepard written the same day (ECF No. 40 at 18).  In the August 26 letter, Chapalet stated that he had forgotten to mention to Shepard that he was concerned about his federal habeas deadline (*id.*).

Chapalet stated, "As you can see my mandate for my direct appeal was August 27, 2009.  I don't want to lose my federal habeas time, so could we please speed the process up on my 3.850 motion." (*id.*).  Chapalet asked Shepard to send him the trial transcripts, prosecutor's file, and written statements of one of the witnesses, and he stated that the could complete his review and revision of Shepard's draft of the Rule 3.850 within two weeks from receipt of the materials (*id.*).  The next day, on August 27, 2010, The Florida Bar sent Shepard a letter stating that it received a Request for Assistance from Chapalet, and that the nature of Chapalet's request suggested that there may have been a lack of communication with Shepard's office which, if substantiated, could constitute a violation of the ethical rules and lead to disciplinary action (ECF No. 24, Ex. 1).  The Bar requested that Shepard contact Chapalet by September 10, 2010, so that the matter could be resolved without a disciplinary filed being opened and investigated (*id.*).  The Bar advised Chapalet (by copy of the letter) that if the Bar did not hear from either him or Shepard within thirty days, the Bar would assume that the matter had been resolved (*id.*).

On October 12, 2010, Shepard filed Chapalet's 3.850 motion (ECF No. 32-1, Ex. G at 104–07).

On November 17, 2010, Chapalet sent Shepard a letter acknowledging that he received a copy of the Rule 3.850 motion that Shepard filed (ECF No. 40 at 23).

Chapalet requested that Shepard set up a conference call to discuss grounds that may be added to the motion (*id.*).  On November 23, 2010, Shepard's office sent a letter to Chapalet notifying him that a telephone conference had been scheduled for December 7, 2010 (ECF No. 40 at 13).

On January 2, 2011, Chapalet sent a letter to Shepard asking him to schedule a telephone conference to update him on the status of the Rule 3.850 motion (ECF No. 61-1, Ex. 1-B).

On February 14, 2011, Chapalet sent a letter to Shepard again requesting a telephone conference to update him on the status of the Rule 3.850 motion (ECF No. 61-1, Ex. 1-C).

On March 22, 2011, Chapalet sent Shepard a letter stating that he had reviewed the Rule 3.850 motion, and that he wanted Shepard to file an amended motion (ECF No. 40 at 21–22).  Chapalet stated that he was working with a prison "paralegal," who was "very skilled and experienced in postconviction relief" (*id.*).  Chapalet informed Shepard that he would be sending his version of an amended Rule 3.850 motion for Shepard's review (*id.*).

On April 19, 2011, Shepard filed an amended Rule 3.850 motion, asserting the same eight claims that Chapalet has asserted in his federal habeas petition (*see* ECF No. 32-1, Ex. G at 110–20; ECF No. 24 at 7–43)).

The State filed a response to the amended Rule 3.850 motion on September 8, 2011 (ECF No. 32-1, Ex. G at 122–33).

On September 12, 2011, Chapalet sent Shepard a letter notifying him that he had been transferred from Graceville Correctional Facility to Hamilton Correctional Institution (ECF No. 61-1, Ex. 1-D).  Chapalet requested that Shepard schedule a telephone conference to update him on the status of the Rule 3.850 motion (*id.*).  Chapalet also indicated that he lost the copy of the amended Rule 3.850 motion that Shepard had provided, and asked Shepard to send another copy (*id.*).

On September 15, 2011, Chapalet sent Shepard another letter, repeating the same things he stated in the letter he sent three days prior (ECF No. 40 at 63).

On October 11, 2011, Chapalet sent Shepard a letter acknowledging he received a copy of the State's response to the amended Rule 3.850 motion (ECF No. 40 at 66).  Chapalet told Shepard to review the "legal work" he was enclosing with the letter, and file it with Shepard's reply to the State's response (*id.*).  On October 18, 2011, the state circuit court set a deadline for Shepard to file a rebuttal to the State's response to the amended Rule 3.850 motion (ECF No. 32-2, Ex. H at 338).  Shepard filed a rebuttal on November 18, 2011 (*id.* at 339–40).

On December 5, 2011, Chapalet sent Shepard a letter referencing a telephone conference they previously had (ECF No. 61-1, Ex. 1-E).  Chapalet also requested a

copy of Shepard's reply to the State's response to the amended Rule 3.850 motion (*id.*).

On January 5, 2012, Chapalet sent Shepard a letter from an inmate named Johnny D. Pelfrey, to Shepard, in which Inmate Pelfrey advised Shepard that Ground Four of the Rule 3.850 motion failed to meet the legal requirements of the Florida Supreme Court (ECF No. 40 at 56).  Chapalet's letter also included a draft pleading (*id.* at 57–59).

On January 19, 2012, Chapalet sent Shepard a letter acknowledging that they had a telephone conference on January 17, 2012 (ECF No. 40 at 54).  Chapalet told Shepard that he was sending a motion that he wanted Shepard to file (telling the Rule 3.850 court that it could not consider information contained in a co-defendant's post-conviction motion) (*id.*).  Chapalet asked Shepard to set up another telephone conference to acknowledge that he received Chapalet's draft motion (*id.*).  Chapalet again requested a copy of Shepard's reply to the State's response (*id.*).  Chapalet also requested that Shepard amend the Rule 3.850 motion to include a specific case citation (*id.*).

On February 10, 2012, Chapalet sent Shepard a letter requesting that Shepard acknowledge receipt of the draft motion that Chapalet sent on January 19, 2012 (ECF No. 40 at 51).  On February 23, 2012, Chapalet sent Shepard a letter asking for an

update on the Rule 3.850 motion, and a copy of Shepard's reply to the State's response (*id.* at 53).

On March 14, 2012, Shepard's office sent Chapalet a copy of the State's response to the amended Rule 3.850 motion (ECF No. 40 at 14). In an order rendered March 22, 2012, the state circuit court summarily denied seven grounds of Chapalet's Rule 3.850 motion and set a limited evidentiary hearing on the remaining ground (Ground Two) (ECF No. 32-2, Ex. H at 365–74). Shepard represented Chapalet at the evidentiary hearing, which was held on June 14, 2012 (ECF No. 32-2, Ex. K).

On June 19, 2012, Chapalet sent Shepard a letter notifying him that he had been transferred from the Bay County Jail (where he was housed for the evidentiary hearing) to Hamilton Correctional Institution (ECF No. 40 at 60). Chapalet told Shepard that he wanted Shepard to file written argument regarding the issue litigated at the evidentiary hearing (*id.*).

On July 2, 2012, Shepard sent Chapalet a letter advising him that he was confident that, after hearing the testimony and oral argument at the evidentiary hearing, the state circuit court understood the facts of the case and their legal position, and that Shepard thus did not feel that written argument was necessary (ECF No. 40 at 15). On July 10, 2012, Chapalet acknowledged receipt of Shepard's letter (*id.* at 55). Chapalet requested that Shepard have him transferred back to the Bay County

Jail until the court ruled on the Rule 3.850 motion, so that Chapalet could visit his family (*id.*).

On August 9, 2012, Chapalet sent a letter to Shepard asking if Shepard had heard anything about the court's decision on the Rule 3.850 motion (ECF No. 40 at 31). In an order rendered August 17, 2012, the circuit court issued a final order denying the amended Rule 3.850 motion (ECF No. 32-2, Ex. J at 609–13).

On September 7, 2012, Chapalet sent Shepard a letter stating that he was concerned "about my appeal that are [sic] being handle [sic] by your office" (ECF No. 40 at 49). Chapalet identified several issues that he wanted Shepard to include in an initial brief (*id.*). Shepard filed a notice of appeal on September 14, 2012 (ECF No. 32-2, Ex. J at 651).

On September 20, 2012, Chapalet sent Shepard a letter confirming that Shepard would not be representing him in the Rule 3.850 appeal, because Chapalet lacked funds to retain Shepard (ECF No. 61-1, Ex. 1-F). Chapalet requested that Shepard send him "all paperwork" pertaining to his case (*id.*). On September 26, 2012, Shepard filed a motion to withdraw in the circuit court (ECF No. 32-2, Ex. J at 657–58). The circuit court granted Shepard's motion to withdraw on October 23, 2012 (ECF No. 32-2, Ex. J at 664).

On October 30, 2012, Chapalet sent Shepard a letter stating that he filed a pro se initial brief in the First DCA, Case No. 1D12-4455, on October 15, 2012, but the First DCA ordered the brief stricken because Shepard was Chapalet's counsel of record (ECF No. 40 at 50).  Chapalet acknowledged that Shepard had filed a motion to withdraw in the circuit court, and asked that Shepard file a motion in the First DCA (*id.*).

On November 29, 2012, Chapalet sent Shepard a letter stating that the First DCA notified him that Shepard was still his counsel of record (ECF No. 40 at 52). Chapalet asked that Shepard contact him, because he (Chapalet) needed to move forward with the appeal (*id.*).

On December 12, 2012, Chapalet filed an Inquiry/Complaint Form with The Florida Bar, complaining that Shepard had not contacted him or notified the First DCA that he was no longer representing Chapalet (ECF No. 40 at 67–69).   On December 17, 2012 and December 21, 2012, Shepard filed motions to withdraw in the First DCA (*see* ECF No. 32-1, Ex. PD-2).  On December 26, 2012, Shepard received a letter from The Florida Bar advising him that Chapalet had filed a request for assistance, and that the nature of Chapalet's request suggested that there may have been a lack of communication with Shepard's office which, if substantiated, could constitute a violation of the ethical rules and lead to disciplinary action (ECF No. 40

at 17).  The Bar requested that Shepard contact Chapalet by January 9, 2013, so that the matter could be resolved without a disciplinary filed being opened and investigated (*id.*).  The Bar advised Chapalet (by copy of the letter) that if the Bar did not hear from either him or Shepard within thirty days, the Bar would assume that the matter had been resolved (*id.*).

On January 10, 2013, the First DCA granted Shepard's motion to withdraw (*see* ECF No. 32-1, Ex. PD-2).  Chapalet filed a pro se initial brief on June 10, 2013 from the Florida State Prison (ECF No. 32-3, Ex. L).  On September 6, 2013, the First DCA affirmed the circuit court's decision denying the Rule 3.850 motion (ECF No. 32-3, Ex. N).  <u>Chapalet v. State</u>, 145 So. 3d 99 (Fla. 1st DCA  2013) (Table).  The First DCA denied Chapalet's motion for rehearing on October 18, 2013 (ECF. No. 32-3, Ex. N).  The mandate issued November 5, 2013 (*id.*).  Prior to issuance of the mandate, Chapalet filed a "Notice of Appeal" in the Supreme Court of Florida, Case No. SC13-2077 (ECF No. 32-3, Ex. O).  The state supreme court dismissed the case for lack of jurisdiction on November 14, 2013 (ECF No. 32-3, Ex. P).  <u>Chapalet v. State</u>, 130 So. 3d 1275 (Fla. 2013) (Table).

On October 17, 2013, while the post-conviction appeal was pending, Chapalet filed a pro se motion to correct illegal sentence, pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure (ECF No. 32-3, Ex. Q).  He argued the same

claim of trial court error that he raised as Ground Three of his amended Rule 3.850 motion (*see* ECF No. 32-1, Ex. G at 113; ECF No. 32-3, Ex. Q).  In an order rendered December 18, 2013, the state circuit court dismissed the motion as not cognizable under Rule 3.800, and impermissibly successive under Rule 3.850(f) (ECF No. 32-3, Ex. R).  The state court warned Chapalet that he may be sanctioned if he persisted in filing successive, repetitious motions (*id.*).

On January 7, 2014, Chapalet filed another pro se Rule 3.800(a) motion from Florida State Prison (ECF No. 32-3, Ex. S at 1–4).  The state circuit court denied the motion in an order rendered January 27, 2014 (*id.* at 6–7).  The copy of the order sent to Chapalet was returned to the court, because Chapalet was transferred to federal custody during the twenty-day period that the motion was pending (*see* ECF No. 32-3, Ex. S at 40–41; *see also* ECF No. 63, Transcript of Evidentiary Hearing at 35).[6]  The state court re-mailed a copy of the order to Chapalet at the Federal Correctional Institution in Tallahassee, Florida, on March 4, 2014 (*see* ECF No. 32-3, Ex. S at 41).  Chapalet filed a notice of appeal in the circuit court on March 12, 2014 (*id.* at 42–43).

---

[6] The court takes judicial notice of its own docket in <u>United States v. Taylor</u>, Case No. 5:13cr13/MW, which was commenced in this district court on March 20, 2013.  On January 13, 2014, this court issued an order directing the clerk of court to issue a subpoena for Chapalet's appearance at the trial of Mr. Taylor on January 27, 2014, in Panama City (ECF Nos. 85, 95).  The clerk issued the subpoena on January 13, 2014 (ECF No. 96).  Chapalet testified at Mr. Taylor's trial on February 4, 2014 (*see* ECF No. 257).  The trial concluded on February 5, 2014 (*see* ECF No. 148).

On March 17, 2014, Chapalet notified the circuit court that he was transferred back to Florida State Prison on March 13, 2014 (*id.* at 46–48).  The First DCA dismissed the appeal, Case No. 1D14-1369, as untimely on April 25, 2014, without prejudice to Chapalet's filing a petition for belated appeal (ECF No. 32-3, Ex. T).  Chapalet v. State, 136 So. 3d 1275 (Fla. 1st DCA  2014) (Mem).

Chapalet commenced the instant federal habeas action on May 2, 2014 (ECF No. 1 at 1).

On or about September 21, 2015, Chapalet filed a petition for belated appeal in the First DCA, Case No. 1D15-4327, seeking to appeal the circuit court's denial of the Rule 3.800(a) motion.  *See* http://www.1dca.org (Search Case No. 1D15-4327).  The First DCA denied the petition on October 7, 2015.  Chapalet v. State, 175 So. 3d 932 (Fla. 1st DCA  2015) (Mem).

II.    TESTIMONY ADDUCED AT EVIDENTIARY HEARING

Chapalet and Attorney Shepard were the only witnesses who testified at the evidentiary hearing on June 23, 2016 (*see* ECF No. 63).  Chapalet testified on direct examination that he and Shepard spoke on the telephone after Shepard was retained, and that he (Chapalet) understood from their conversation that Shepard would pursue Chapalet's direct appeal and state post-conviction remedy, and that Shepard would strive to protect Chapalet's one-year federal deadline (ECF No. 63, Transcript of

Evidentiary Hearing ("Tr.") at 6–7, 8–9, 13).  Chapalet testified that Shepard was not retained to file a federal habeas petition, but Chapalet understood the retainer agreement as requiring Shepard to "protect" Chapalet's federal deadline (Tr. at 9, 28). Chapalet testified that he received communication from Shepard that the direct appeal would probably not be successful, and that Chapalet's best course of action was a Rule 3.850 motion (Tr. at 7).  Chapalet testified that he and Shepard discussed this on the telephone (Tr. at 7–8).  Chapalet testified that he understood, based upon his research in the prison law library, that the deadline for filing a Rule 3.850 motion was two years from the date of the mandate on direct appeal, and the deadline for filing a federal habeas petition was one year from the date of the mandate on direct appeal (Tr. at 8).  Chapalet testified that he was aware that the federal deadline could expire before the deadline for filing a Rule 3.850 motion (Tr. at 9).

Chapalet testified that when the direct appeal concluded, and his state and federal post-conviction limitations periods began to run, he and Shepard had a telephone conference (Tr. at 10–11).  Chapalet testified that Shepard told him he would visit him "after the holidays" in 2009 (Tr. at 11).  Chapalet testified that after their telephone conference, he (Chapalet) knew that his federal deadline had started running when his direct appeal concluded, so he kept writing letters to Shepard (Tr. at 10).  Chapalet testified that he communicated his concern about his federal deadline

in his letters to Shepard (Tr. at 12).  Chapalet testified that Shepard did not respond to his letters until August of 2010, after Chapalet complained to The Florida Bar that Shepard was not responding to any of his letters or his family's telephone calls, that Shepard was "dragging" the filing of the Rule 3.850 motion, and that the federal deadline was running (Tr. at 10, 12).  Chapalet testified that he wrote Shepard a letter on August 26, 2010, because he had forgotten to mention his concern about the federal deadline to Shepard during their telephone conversation earlier that day (Tr. at 12–13, 27).  Chapalet testified that he received a letter from The Florida Bar advising him that Shepard had been notified of his request for assistance (Tr. at 14).  Chapalet testified that the week after he received the letter from The Florida Bar, Shepard again contacted him by telephone and then came to visit him (Tr. at 11–14).  Chapalet testified that during that telephone conversation, Shepard told him that the Rule 3.850 motion was ready to file, but that he (Chapalet) needed to sign some papers (Tr. at 14–15).  Chapalet testified that he subsequently received the papers from Shepard (Tr. at 15).  Chapalet testified that he also mentioned the federal deadline to Shepard when Shepard visited him in person (*id.*).  Chapalet testified that he believed that all but four days of the federal statute of limitations had expired when Shepard filed the Rule 3.850 motion (Tr. at 15).

On cross-examination, Chapalet was asked whether the August 26, 2010, letter to Shepard was the first time Chapalet had mentioned the federal deadline to Shepard (Tr. at 27).  Chapalet responded no, but when asked to specify any other time he had mentioned the federal deadline to Shepard, Chapalet was vague:

> Q [by Mr. Duffy for the State].  . . . When did you do that other times?
>
> A.    From the beginning.  I just—I mentioned that in the letter [dated August 26, 2010] because I forgot to bring it to his attention over the phone that my time was, you know, it was real short.
>
> Q.    Uh-huh.
>
> A.    It was real short.
>
> Q.    I understand that.  And why did you feel that you—had you mentioned it to him before?
>
> A.    Yes, sir.  He'd been aware that I got one year federal time.  He'd been aware of that.
>
> Q.    When was he made aware of that?
>
> A.    Like 2009, he'd been aware of that.
>
> Q.    By whom?  Who made him aware of that?
>
> A.    I did, because I found out from the law clerks and the law library.  I mean, he's a lawyer so, you know, he know, he got to protect my federal one year.  It's in the agreement.
>
> Q.    And it's your belief that any lawyer who represents you knows all aspects of federal and state law?

> A.    Yeah.  It was in the agreement.  I mean, it's in the contract, agreement, my postconviction.

(Tr. at 28).  Chapalet acknowledged that the only letter to Shepard which mentioned the federal deadline was the August 26, 2010 letter, but he insisted he verbally mentioned the deadline to Shepard (*id.* at 28–29).

Regarding Shepard's communication with Chapalet during the five-year period that Shepard represented him (June 27, 2007 to October 23, 2012), Chapalet testified that Shepard visited him "a few times" while Chapalet was housed at Graceville Correctional Facility (Tr. at 29).[7]  Chapalet testified that Shepard spoke with him on the telephone on numerous occasions (Tr. at 29).

Chapalet acknowledged that "inmate law clerks" were available to assist him in filing post-conviction applications which Attorney Shepard was not retained to file, for example Rule 3.800 motions and his federal habeas petition (Tr. at 36–37). Chapalet also acknowledged that the form for filing a federal habeas petition was always available to him (*id.* at 38).

Attorney Shepard testified that he was admitted to the practice of law in November of 2000, and was a state prosecutor until 2004, when he opened a criminal defense practice (Tr. at 40–41).  He testified that he had handled well over one

---

[7] According to Chapalet's correspondence, he was housed at Graceville from approximately September of 2009 to September of 2011 (*see* ECF No. 40 at 54; ECF No. 61-1, Ex. 1-D).

thousand criminal cases as a defense attorney, and was very familiar with Florida criminal law (*id.* at 41).  Shepard testified that he was a member of the American Bar Association, the Bay County Bar Association, and the Florida Association of Criminal Defense Lawyers (*id.* at 41–42).  He testified that he served as president of the Bay County Bar Association from 2007 to 2010, served as president of the Fourteenth Judicial Circuit Criminal Defense Bar from 2011 to 2015, and was currently the local representative to the statewide Criminal Defense Bar (*id.* at 42).  Shepard testified that he sometimes appeared in federal court, but he never handled any federal habeas cases (*id.*).

Attorney Shepard testified that from 2007–2010, he was a partner in the firm of Appleman, Shepard, and Trucks (Tr. at 42).  Shepard testified that he left the firm and started his own firm, with another partner, in December of 2011 (*id.*).

Attorney Shepard was shown the written retainer agreement which is part of the record in this case (*see* ECF No. 40 at 7–10), and testified that it was consistent with the kind of retainer agreement he used in 2007 (Tr. at 43–45).  Shepard testified that it was the firm's policy to maintain a signed retainer agreement in the file, but he did not find a signed agreement in Chapalet's file.[8]  Shepard testified that he believed that

---

[8] Attorney Shepard testified that his former law firm had delivered Chapalet's file to him in 2012 at his request, but that the file was "a disaster," in no particular order and with pleadings seemingly having been unbound, so he could not be confident that the file was complete (Tr. at 44, 52, 57–58, 68–69).  However, upon the court's specific inquiry as to whether documents relevant

Chapalet's mother signed the retainer agreement, but he did not have a specific recollection of her signing it (*id.* at 44).

Attorney Shepard testified regarding the scope of his representation of Chapalet as follows:

> Q [by Mr. Duffy].  Okay.  What did you mean by postconviction relief or postconviction, whatever the language is [in the written agreement]?
>
> A.      I think it's really important to understand kind of where Edwardo [Chapalet] was.  He really didn't have what I—boy, I don't know the right way to say this without—I guess just say it.
>
> His lawyer had advised him that, if he filed for a demand for speedy trial, that the state would be locked into the charging document, couldn't change any of the information.
>
> Well, the alleged name of—I think it was the person who was accused of extortion, the alleged victim, was different.  Like, they put the wrong name in the information.  And Mr. Chapalet's attorney, who I believe was Joe Aldridge, had told him, "Look, if we file a demand for speedy trial, they are locked into that, and they can't prove it, because that person doesn't exist."
>
> So he got there the morning of trial—and this actually I think bears out on the actual record.  He got there the morning of trial, and Mr. Aldridge allowed the jury to be sworn, and then said, "Okay. Then, Judge, I have an objection because this person doesn't exist," and the judge said, "Well, it's kind of untimely, because, you know, we need to get to the close of the state's evidence to see if there really is any

---

to this federal habeas proceeding may be missing from Shepard's file (*id.* at 65–68), Shepard testified, "I believe we have all of the relevant documents from my file and—well, and I doubt there's any other documents" (*id.* at 68–69).

evidence." And then Mr. Aldridge—I mean, the record is what it is. I don't know if that's a part of this record or not.

Q.      Yes, it is.

A.      But the judge essentially said, "No, we're going to allow him to amend it, that's going to happen, and here we go."

And my recollection is that Mr. Chapalet hadn't really been advised that this was a possible outcome. He had been pretty much told by his lawyer, "Look, this is a sure shot, we got them."

So in talking with Mr. Chapalet, it was like, okay, we've got two things that have happened here. Either the judge has made an error, or the—or your attorney has I feel made an error. So we took a direct appeal. And maybe I'm getting ahead of your question here, counsel.

Q.      Feel free.

A.      But what we did, we did a direct appeal. On the direct appeal, the issues that—when I spoke with Mr. Chapalet, there were a number of issues that I had identified that I thought were good issues. Upon reading the actual written record, the way that they came out wasn't exactly as we had talked about, the issues. And after I did the research, the research led me to believe there is really nothing here.

I knew Mr. Chapalet would not agree with that. He's sitting in prison. He's my client. My job is to help him, hopefully, get out of prison. So I knew that he wouldn't necessarily think that that was a good idea and, basically, be saying, "Why have I paid you all of this money and you've done some research and now we are at nothing?"

So I filed an *Anders* brief, while I know that is probably not appropriate. And then what I did is I think—my recollection is we tried to get the DCA to allow Mr. Chapalet to follow up with them, because I wanted him to understand, look, this is not just my interpretation of the law, this is the DCA's interpretation of the law either. And why I say that is because my understanding is what happens when you file an

*Anders* brief is the court and clerks actually take it and look at the issues that you brought up, just confirm that the lawyer filing the brief is indeed correct, and that there are no appealable issues there.

That took a long time. I do not practice appellate law anymore. However, when I did, my philosophy is, if we are going to have a direct appeal followed by a 3.850, I was going to let that record sit and not do anything until we got it denied.  In part because I feel like if you let it sit—and, granted, it was a very long period of time that the DCA had that case.  It was a very long period of time.  You've got almost like a fresh set of eyes back on that record, and you're able to read it again.

With Mr. Chapalet, when we got that back [the First DCA's decision], . . . my feeling was, this is the shot we've got, because I really don't think he got a fair shot at trial.  I understand legally he did.  My personal, nonlegal opinion, I guess, is that he didn't.  And so I was really focused on trying to put together the best possible brief that we could put together.

I am aware of his allegations that we didn't communicate during that period of time [between the conclusion of the direct appeal and the commencement of the Rule 3.850 proceeding].  I believe I did not communicate with him as often as I had during the times previous.  I was actually looking through my file; and, I mean, it was at one point we were like talking every month or every couple of months.

The other thing, too, that should be noted, Mr. Chapalet is a, and to his credit, is a prolific letter writer.  But I don't see a lot of communication during that particular period of time, and I don't—I'm not really sure why.  And that's by Mr. Chapalet or by myself, but I know that we did not have as much communication during that period of time as we had prior or after.

THE COURT:  Tell me the precise period of time you are talking about so I'm clear.

THE WITNESS:  I'm sorry.  Between the end of direct appeal and the filing of the 3.850.

THE COURT:  Okay.

THE WITNESS:  The other thing, too, and I think I need to say this, I know—at some point I became aware of the federal habeas corpus, and this is going to—I hate to admit this, but it's true.  I had no idea that there was a deadline for a federal habeas corpus.  I really never even read a federal habeas corpus.

My understanding of our—my retainer was I was hired for the direct appeal, which we did; and, of course, we ended up fighting for Mr. Chapalet to have a say on my reading of the law there, as well as the 3.850, which we did.  And I know that the court denied that 3.850 after a hearing, but—and I have not read the documents coming back, but I really thought we had a good 3.850, particularly on that ground two.

The last argument in front of the judge, the lawyer who was being the subject of the 3.850, actually—I think what he was saying was, "I don't recall."  So it was, "Did you tell Mr. Chapalet that, you know, that he would be locked into the information, that the state would be locked into the information and have to dismiss the case?"  His answer was, "I do not recall."  So the only un-refuted testimony at that 3.850 was Mr. Chapalet's testimony of, "Hey, you know, this is what my lawyer told me," and when you read the record it was very consistent with Mr. Chapalet's testimony.

So, you know, we ended on that note.  Mr. Chapalet contacted me after that.  He wanted me to file a written response, but I, quite frankly, I don't know how it could have ended better for us.  I thought if we filed a written response, we would be begging a response from the state, and I didn't think—I thought it really had ended as well as it could have.  I know I have answered far more than your question.

BY MR. DUFFY:

Q.  Was that the strategical decision on your part not to file a written response?

A.      Yeah.  I thought it ended as well as it could.  In fact, I think that went on appeal as well.  I think Mr. Chapalet ended up appealing that, and I don't know whether he was appointed a public defender for that or if he appealed it on his own.  I don't specifically recall.  But I thought it was—I thought it was a ripe issue for appeal, to say the least.

(Tr. at 45–50).

The undersigned also elicited testimony from Attorney Shepard about the scope

of his representation:

THE COURT:   Mr. Shepard, I noticed that you were in the courtroom when Mr. Chapalet testified, so you heard him answer questions concerning the scope of your representation.  The retainer agreement that is part of the record is somewhat vague.  It simply states, quote, postconviction relief, which can mean a lot of different things.

It appeared from his testimony that it was certainly for the direct appeal and the Rule 3.850 proceedings; however, Mr. Chapalet additionally testified that part of your representation was to, quote, protect the federal deadline.

I would like to hear from your—in your own words, in your mind, was that part of your agreement with him or part of your representation, sir.

THE WITNESS:   Your Honor, my—I think the representation that was contemplated in the retainer agreement and after the retainer agreement, my recollection is that I talked to them specifically about direct appeal; and I kind of—my memory gets a little hazy here with regard to the 3.850, and it's because of something that Edwardo said earlier today, because I think that it may be what actually happened, but—

My recollection is, once the 3.850—or I'm sorry—once the direct appeal came back, I was—I just didn't feel good about it, because it was an _Anders_ brief.  They paid me $15,000 to do an _Anders_ brief.  Nobody

pays you $15,000 to file an appeal that's not an appeal.  So I was going to handle the 3.850, because that's where the beef was.

I can't remember whether we contemplated that when we signed the—when we did the retainer agreement or if that was just something I said, "Look, I'm going to do this, because it's just kind of the right thing to do."

But I do not recall discussing anything about a federal habeas corpus with Mr. Chapalet prior to the filing of the 3.850, when I would have found out about it there.

THE COURT:      Meaning, you found out about the deadline moving and your need to get the 3.850 filed.

THE WITNESS:     Correct.  That is not something that I recall like that is—actually, it's not a recall.      That is not something contemplated—that we contemplated in the retainer.  I would not have offered to do that.  I still to this day have only read part of one [a federal habeas petition], never file [sic] one.

(Tr. at 63–65).

With regard to Chapalet's federal habeas deadline, Attorney Shepard testified

as follows:

Q [by Mr. Duffy].  The time limit for federal habeas, you did not know that until when?

A.      I did not know that, and I don't know—Mr. Chapalet had sent—I saw that there was a letter in the record that Mr. Chapalet had sent regarding that.  I do recall a conversation, but I don't recall when it happened about the federal habeas corpus.  I know at some point I became very aware of it, and we made the deadline.  I know we made it very, very close.

I would submit to the court, had I been aware, I certainly would have filed it previous to that. I don't know what was going on there.

THE COURT:        Was that intentional?

THE WITNESS:   No.

THE COURT:        I mean, filing it in time. You said, I know we made the deadline. Was that intentional?

THE WITNESS:   Yes.

THE COURT:        Having learned it, you filed it on time?

THE WITNESS:   Yes. We had more time to go with the 3.850. And, frankly, with that 3.850, that was his shot. So I wanted to make sure we had everything there. So I really wanted to make sure that 3.850 was jam-up, pardon the colloquialism there. I really thought that was the best shot that we had to get him back in court.

. . . .

BY MR. DUFFY:

Q.    I'm going to show you what's been in the record at Document 40, page 18 [the letter from Chapalet to Shepard dated August 26, 2010], and this is what I meant to show you, not the other one.

Do you recall receiving that letter?

A.    I don't—I mean, a specific recollection, but it appears to be addressed to me. I'm sure it's a letter from him to me; yes, sir.

Q.    Can you find a reference to federal time in that document?

A.    Right. It's right there where he says, "I forgot to bring to your attention the federal time, the habeas corpus, concerning the 3.850."

> Q.     Could that possibly be or is that maybe the time you first heard about that there was a federal time limit different from the Florida limit?
>
> A.     It may have been.  It may have been prior to—really prior to that.  I don't recall.  I just recall becoming aware of it at some point and going, "Okay.  Then we are on the gas; we're going to get this filed."
>
> Q.     And you filed basically a placeholder motion, and then amended it, correct?
>
> A.     Correct.

(Tr. at 50–53).  Attorney Shepard testified that he remembered that Chapalet told him about the one-year federal deadline in a telephone conversation, but he could not recall whether the conversation was before or after Chapalet's August 26, 2010 letter (*id.* at 63).  Shepard testified that he learned of the federal deadline "at the latest" when he received Chapalet's August 26, 2010 letter, but he may have learned of it prior to that (*id.* at 60).

Attorney Shepard testified that during his representation of Chapalet, he had "ample" communication with Chapalet (Tr. at 58).  He testified that although he did not have as much contact with Chapalet during the period between the conclusion of the direct appeal and the commencement of the Rule 3.850 proceeding, he recalled having "a lot" of communication with Chapalet during the course of his five-year representation (*id.* at 58, 67).  Shepard explained that he communicated more with Chapalet when there was something pending, or activity in the case that required

Chapalet's participation, such as preparing for the evidentiary hearing in the Rule

3.850 (*id.* at 67).  Shepard explained that upon conclusion of the direct appeal, the

next matter within the scope of his representation was filing the Rule 3.850 motion,

which he knew he had two years to file (*id.* at 59, 67).

Chapalet's counsel, Mr. Hammons, questioned Attorney Shepard regarding the

six-week delay between Chapalet's August 26, 2010 letter, and Shepard's filing the

Rule 3.850 motion on October 12, 2010:

> Q.     Okay.  You got the letter, dated August 26, 2010, that's
> Document 40, page 18, August 26, 2010.  And he signed it, Mr. Chapalet
> is telling you, "You know, my federal time is running," and you still
> didn't file the state 3.850 until October the 12th of 2010; is that correct?
>
> A.     I believe so.  The documents—I don't have the documents
> in front of me; but, yes, sir, I filed them when I filed them.  I'm not
> contesting them.
>
> Q.     You waited almost another two months after you had been
> told by Mr. Chapalet that, "Hey, the clock is running on me," and you
> could have at least at that point, if you were representing him, said,
> "Wow, look it up, that's a year, I'll file something tomorrow."  In which
> case he would have lost a lot of his time, but he wouldn't have had two
> days left or three days left.
>
> A.     Quite frankly, sir, if I had known about this federal habeas
> corpus, I would have kind of gone away from what I normally do and
> probably written a 3.850 so we could have filed it as soon as it came
> back from the DCA.  I didn't realize that this was a time limitation that
> was going to be detrimental to Mr. Chapalet.
>
> Q.     You knew that, as of August 26th, he's telling you in a letter
> it's running?

A.    Yes, sir.

Q.    And you had the opportunity—you knew then or even before that it's a year and the clock is running, and still you waited another two months, or not quite two months, to file on October the 12th of 2010 the state 3.850, which then stopped the clock on the federal habeas.  Can you give me some reason why it took that long?

A.    I do not know, sir.
. . . .
Q.    That could have been filed a year earlier?

A.    Yes, sir.

(Tr. at 60–62).

## III.    ANALYSIS

Pursuant to the requirements set forth in 28 U.S.C. § 2244, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, which became effective on April 24, 1996, a one-year period of limitation applies to the filing of a habeas petition by a person in custody pursuant to a state court judgment.  The limitation period runs from the latest of:

(A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized

by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)   the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Section 2244(d)(1).

Respondent argues, and Chapalet does not dispute, that the appropriate statutory trigger for the federal limitations period is the finality date of the judgment of conviction, pursuant to § 2244(d)(1)(A) (*see* ECF No. 32 at 4; ECF No. 24 at 47). Under federal law, the judgment becomes final for purposes of § 2244(d)(1)(A) upon expiration of the 90-day period in which a defendant may seek direct review of his conviction in the United States Supreme Court.  The 90-day period runs from the date of entry of the judgment sought to be reviewed.  *See* Chavers v. Sec'y, Fla. Dep't of Corr., 468 F.3d 1273, 1275 (11th Cir. 2006).  Federal Rule of Civil Procedure 6(a) provides that "[i]n computing any period of time prescribed or allowed by . . . any applicable statute, the day of the act, event or default from which the designated period of time begins to run shall not be included."  Fed. R. Civ. P. 6(a); *see also* Washington v. United States, 243 F.3d 1299, 1301 (11th Cir. 2001) (Rule 6 applies to calculation of one-year statute of limitations under AEDPA).

Here, the 90-day period for seeking certiorari review was triggered by the First DCA's affirmance of Chapalet's conviction, on July 16, 2009, and it expired 90 days

later, on October 15, 2009.  Therefore, the statute of limitations began to run on October 16, 2009, the day after the 90-day period for Chapalet to file a petition for review in the United States Supreme Court expired.  Chapalet had one year from that date, or until October 16, 2010, to file his § 2254 petition.  *See* Downs v. McNeil, 520 F.3d 1311, 1318 (11th Cir. 2008) (limitations period should be calculated according to "anniversary method," under which limitations period expires on anniversary of date it began to run) (citing Ferreira v. Dep't of Corr., 494 F.3d 1286, 1289 n.1 (11th Cir. 2007)).  Chapalet did not file his federal petition on or before October 16, 2010; therefore, it is untimely unless tolling principles apply and render it timely.

"Because the time period specified in 28 U.S.C. § 2244 is a statute of limitations, not a jurisdictional bar, the Supreme Court has held § 2244(d) does not bar the application of equitable tolling in an appropriate case."  Cole v. Warden, Ga. State Prison, 768 F.3d 1150, 1157 (11th Cir. 2014) (citing Holland v. Florida, 560 U.S. 631, 645, 130 S. Ct. 2549, 177 L. Ed. 2d 130 (2010)).  "[A] petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing."  Holland, 560 U.S. at 649.  As an extraordinary remedy, equitable tolling is "limited to rare and exceptional circumstances and typically applied sparingly."  Cadet v. Fla. Dep't of Corr., 742 F.3d 473, 477 (11th Cir. 2014).

Equitable tolling is assessed on a case-by-case basis, considering the specific circumstances of the case.  Hutchinson v. Florida, 677 F.3d 1097, 1098 (11th Cir. 2012); *see* Holland, 560 U.S. at 649–50 (clarifying that the exercise of a court's equity powers must be made on a case-by-case basis).  A petitioner has the burden of establishing his entitlement to equitable tolling; his supporting allegations must be specific and not conclusory.  Hutchinson, 677 F.3d at 1099.  "The diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence."  Holland, 560 U.S. at 653; *see also* Smith v. Comm'r, Ala. Dep't of Corr., 703 F.3d 1266, 1271 (11th Cir. 2012) (per curiam) (acknowledging petitioners are not required "to exhaust every imaginable option, but rather to make reasonable efforts").  Determining whether a factual circumstance is extraordinary to satisfy equitable tolling depends not on how unusual the circumstance alleged to warrant tolling is among the universe of prisoners, but rather how severe an obstacle it is for the prisoner endeavoring to comply with AEDPA's limitations period.  Cole, 768 F.3d at 1158 (quotation marks and citation omitted).

"[Equitable] [t]olling based on counsel's failure to satisfy AEDPA's statute of limitations is available only for 'serious instances of attorney misconduct.'"  Christeson v. Roper, — U.S. —, —, 135 S. Ct. 891, 894, 190 L. Ed. 2d 763 (2015) (quoting Holland, 560 U.S. at 651–52).

In Thomas v. Attorney Gen., Fla., 795 F. 3d 1286 (11th Cir. 2015), the Eleventh

Circuit articulated the types of attorney misconduct that may serve as an extraordinary

circumstance to support a claim to equitable tolling:

> [W]e have explained that attorney negligence, and even gross negligence
> or recklessness, is not an extraordinary circumstance; "abandonment of
> the attorney-client relationship . . . is required." Cadet, 742 F.3d at 481.
> At the same time, the factors we had identified in Holland I—"bad faith,
> dishonesty, divided loyalty, [and] mental impairment," 539 F.3d at
> 1339—may still serve as extraordinary circumstances that support a
> claim to equitable tolling.  On remand, therefore, the district court must
> decide whether [petitioner's attorney's] conduct amounted to an
> abandonment of [the petitioner], as that concept has developed in
> Holland II, Maples, and Cadet, or whether her conduct nonetheless
> amounted to serious instances of attorney misconduct warranting
> equitable tolling.

Thomas, 2015 WL 4597532, at *5 (citing Cadet v. Fla. Dep't of Corr., 742 F.3d 473

(11th Cir. 2014); Holland v. Florida (Holland I), 539 F.3d 1334 (11th Cir. 2008),

rev'd on other grounds, 560 U.S. 631, 130 S. Ct. 2549, 177 l. Ed. 2d 130 (2010)

(Holland II); Maples v. Thomas, — U.S. —, 132 S. Ct. 912, 181 L. Ed. 2d 807

(2012)).

In determining whether attorney conduct warrants equitable tolling, Chapalet

must establish that Attorney Shepard's "failings were so egregious as to constructively

sever the agency relationship between [Shepard] and [himself], thus excusing [him]

from [] bearing the risk of his attorney's mistake."  Damren v. Florida, 776 F.3d 816,

822 (11th Cir. 2015); see also Cadet, 742 at 481 (holding that under "well-settled

principles of agency law, . . . a petitioner bears the risk of attorney error unless his attorney has essentially abandoned him and thereby severed the principal-agent relationship" (citing Maples, 132 S. Ct. at 922–23)).

In Cadet, the Eleventh Circuit articulated the appropriate standard for gauging when attorney error amounts to an extraordinary circumstance, in light of the Supreme Court's decisions in Maples and Holland:

> The Supreme Court in Holland did not actually decide whether Holland himself was entitled to equitable tolling. 130 S. Ct. at 2565. Still, the majority opinion in that case, read by itself, could be interpreted to mean that attorney misconduct amounting to more than "garden variety" negligence, but falling short of abandonment, may warrant equitable tolling. The Holland opinion, however, cannot be read by itself. Instead, that opinion must be read in light of the Court's explanation of Holland eighteen months later in its Maples decision. In Maples the Court pointed out that the petitioner in Holland had "urged that attorney negligence was not the gravamen of his complaint. Rather, he asserted that his lawyer had detached himself from any trust relationship with [him] . . . [and had] abandoned [him]. . . ." Maples, 132 S. Ct. at 923 (quotation marks omitted). The Maples Court characterized Holland as a case of attorney abandonment, not one of gross negligence, emphasizing that it involved "counsel's near-total failure to communicate with petitioner or to respond to petitioner's many inquiries and requests over a period of several years." Id. (quoting Holland, 130 S. Ct. at 2568 (Alito, J., concurring)). In the course of doing so, the Court reached back to Justice Alito's concurring opinion in Holland and adopted its distinction between attorney negligence, however styled and however egregious, on the one hand, and attorney abandonment on the other. See id. at 923 & n.7. And the Court stated that the critical distinction between any kind of negligence and abandonment applies in both the equitable tolling and procedural default contexts. Id.

The Supreme Court explained in <u>Maples</u> that the critical distinction between attorney negligence and attorney abandonment is grounded in "well-settled principles of agency law," under which a petitioner bears the risk of attorney error unless his attorney has essentially abandoned him and thereby "severed the principal-agent relationship." *Id.* at 922–23.  The Court reiterated the rule that a petitioner is bound by his attorney's mistake in missing a filing deadline ("We do not disturb that general rule"), but held that "[a] markedly different situation" exists when "an attorney abandons his client without notice, and thereby occasions the default." *Id.* at 922.  The client is not responsible for what happens after his attorney abandons him.

In light of the Supreme Court's <u>Maples</u> decision, we hold that attorney negligence, however gross or egregious, does not qualify as an "extraordinary circumstance" for purposes of equitable tolling; abandonment of the attorney-client relationship, such as may have occurred in <u>Holland</u>, is required.  Applying that standard to this case, our inquiry is whether Cadet "has shown that his attorney . . . abandoned him, thereby supplying the 'extraordinary circumstances'" necessary to warrant equitable tolling of the § 2244(d) statute of limitations period. *See id.* at 924.

<u>Cadet</u>, 742 F.3d at 480-83 (footnotes omitted).  The court in <u>Cadet</u> explained the

difference between negligence and abandonment:

Goodman's negligence in missing the filing deadline does not mean that he abandoned or effectively abandoned Cadet.  Negligence, however gross, is not the same as abandonment.  If it were, there would be no point in <u>Maples</u>' refinement or explication of what <u>Holland</u> said.  Abandonment, which <u>Maples</u> made the standard, denotes absolute renunciation or withdrawal, or a complete rejection or desertion of one's responsibilities, a walking away from a relationship. *See* Black's Law Dictionary 2 (6th ed. 1990) (defining "abandon" as "[t]o give up absolutely; to forsake entirely; to renounce utterly; to relinquish all connection with or concern in; to desert"); Random House Webster's Unabridged Dictionary 2 (2d ed. 2001) (defining "abandon" as "to leave completely and finally; forsake utterly; desert," or "to give up;

discontinue, withdraw from"); Webster's New World College Dictionary 1 (3d ed. 1991) (defining "abandon" as "to give up (something) completely or forever" and explaining that it "implies leaving a person or thing, either as a final, necessary measure . . . or as a complete rejection of one's responsibilities, claims, etc."); *see also* Harris v. United States, 367 F.3d 74, 81 (2d Cir. 2004) (equating "abandonment" with "physical disappearance or constructive disappearance") (citations omitted); State v. Bradley, 811 S.W. 2d 379, 384 (Mo. 1991) (defining "abandonment" as conduct that amounts to "a total default in carrying out the obligations imposed upon [ ] counsel," not merely ineffective assistance).

Goodman did not withdraw from representing Cadet, renounce his role as counsel, utterly shirk all of his professional responsibilities, or walk away from their attorney-client relationship.  Unlike the lawyer in Holland, Goodman did not fail to keep his client abreast of key developments in his case, did not ignore his client's inquires or concerns, and did not sever nearly all communication with his client for a period of years—or even for months or even for weeks. *See* Holland, 130 S. Ct. at 2564 (counsel, among other deficiencies, "failed to inform Holland in a timely manner about the crucial fact that the Florida Supreme Court had decided his case, [ ] despite Holland's many pleas for that information," and "failed to communicate with his client over a period of years, despite various pleas from Holland that [counsel] respond to his letters"); Maples, 132 S. Ct. at 923 (characterizing Holland as a case of abandonment involving "counsel's near-total failure to communicate with petitioner or to respond to petitioner's many inquiries and requests over a period of several years") (quotation marks omitted).  And unlike the lawyers in Maples, Goodman did not wholly desert, forsake, or abandon his client without notice, thereby ceasing to serve as his agent "in any meaningful sense of that word" and leaving him "without any functioning attorney of record."  *See* Maples, 132 S. Ct. at 924–27. Instead, Goodman maintained regular contact with Cadet throughout his state post-conviction proceedings; responded to all of his many inquiries and concerns about the federal filing deadline; sent him copies of the relevant statutory language and state appellate court opinion; and prepared and eventually filed a § 2254 petition on his behalf.

Although Goodman did fail to file that § 2254 petition on time, he did not willfully disregard Cadet's instructions that he do so.  Based on his misreading of § 2244(d), Goodman genuinely believed that he had ample time in which to prepare and file a federal habeas petition following the conclusion of Cadet's Rule 3.850 proceedings.  As Justice Alito noted in his <u>Holland</u> concurrence, articulating the critical distinction that would become the <u>Maples</u> standard, an attorney's miscalculation of the filing deadline, inadvertent failure to file a § 2254 petition on time, or failure "to do the requisite research to determine the applicable deadline" are all types of errors that are "constructively attributable to the client."   <u>Holland</u>, 130 S. Ct. at 2567 (Alito, J., concurring).

<u>Cadet</u>, 742 F.3d at 484–85.

The issue in this case, as framed by the District Judge upon remand to the undersigned for the evidentiary hearing, is "whether the [federal] clock stopped—was equitably tolled—for some or all of the period from October 16 2009 to October 12, 2010" (ECF No. 47 at 3).  The District Judge instructed the undersigned to "develop fully the critical findings of fact—the when, the 'what, the how, and most importantly, the why' of the scope of representation from its inception and the reasons Shepard did not file the Rule 3.850 motion until October 12, 2010" (*id.* at 10–11).

The undersigned finds from the evidence that Attorney Shepard was retained to represent Chapalet in June of 2007.  This is evidenced by (1) Chapalet's letter to Shepard dated May 28, 2007, in which Chapalet told Shepard that his (Chapalet's) mother had funds to retain Shepard, (2) the payment arrangements set forth in the retainer agreement, which provided that the first payment was due on June 15, 2007,

and (3) Shepard's filing a notice of appearance in the state circuit court and appellate court on June 27, 2007.  The scope of Shepard's representation initially included representing Chapalet only on direct appeal, but the scope expanded in August of 2008, to include Shepard's representing Chapalet in a Rule 3.850 proceeding.  This is evidenced by Shepard's letter to Chapalet dated August 5, 2008, and Shepard's testimony.  The parties do not dispute that Shepard's representation did <u>not</u> include filing Chapalet's federal habeas petition.  Chapalet testified that he believed that Shepard's representation included "protecting" his federal habeas deadline, and he also testified that Shepard's obligation to preserve his federal deadline was "in the agreement" (Tr. at 28).  However, the written retainer agreement does not mention federal habeas, federal post-conviction relief, or preserving or protecting a federal deadline.  Further, there is no evidence of a mutual understanding between Shepard and Chapalet that the scope of Shepard's representation included preserving Chapalet's federal deadline by filing the Rule 3.850 motion by a certain date.  Therefore, the undersigned finds that the scope of Shepard's representation did not include filing a federal habeas petition or preserving a federal habeas deadline.

The next issue is whether Shepard abandoned Chapalet, thereby severing the principal-agent relationship, during any period relevant to the federal statute of limitations, which commenced on October 16, 2009.  Shepard explained that upon

conclusion of the direct appeal, the next matter within the scope of his representation was researching, drafting, and filing the Rule 3.850 motion, and he knew that he had two years from August 27, 2009, to file the Rule 3.850 motion (Tr. at 59, 67).  The evidence shows that Chapalet wrote to Shepard on October 23, 2009, and Chapalet mentioned that his sister had spoken with Shepard on the telephone.  In December of 2009, Shepard called Chapalet, and the two had a telephone conference.  Chapalet wrote Shepard a letter on January 29, 2010, and March 10, 2010.  In both letters, Chapalet simply reminded Shepard that he had promised to visit him after the holidays and asked Shepard to update him on the status of Shepard's drafting the Rule 3.850 motion.  Chapalet made no mention of a federal deadline or that a federal statute of limitations was running.  Shepard did not respond to either letter.  Five months elapsed with no communication from either Shepard or Chapalet.  Then Chapalet wrote to Shepard on August 22, 2010, and Shepard called Chapalet four days later, on August 26, 2010.  This conference was obviously prior to Shepard's receiving the letter from The Florida Bar, because the Bar's letter is dated August 27, 2010.  Chapalet testified that approximately one week after the Bar's August 27 letter, Shepard again contacted him by telephone.  Chapalet testified that Shepard then sent him paperwork that required his signature, presumably the Rule 3.850 motion.  Chapalet testified that after that, Shepard visited him in person.  The Rule 3.850

motion bears Chapalet's signature, and it also bears the notary stamp of Shepard's legal assistant, Laura Farmer on October 12, 2010 (*see* ECF No. 32-1, Ex. G at 104–07; ECF No. 40 at 13). Shepard filed the Rule 3.850 motion the same day (October 12, 2010), prior to expiration of the federal deadline.  Once Shepard commenced the Rule 3.850 proceeding (again, the only post-conviction proceeding for which he was retained), he actively litigated the case by filing an amended motion and a reply to the State's response to the motion, responding to court orders, representing Petitioner during the evidentiary hearing, and filing a timely notice of appeal of the circuit court's final order denying the Rule 3.850 motion.

Chapalet testified at the evidentiary hearing that he communicated concern about the federal deadline in his letters to Shepard over the course of Shepard's representation.  Chapalet testified that after his and Shepard's telephone conference in December of 2009, Chapalet knew that his federal deadline was running, so he wrote letters to Shepard communicating his concern about the federal deadline  (Tr. at 10, 12).  However, the record does not bear this out.  The letters themselves, including the letters that Chapalet wrote on January 29, 2010, March 10, 2010, and August 22, 2010, demonstrate that Chapalet did not mention a federal deadline until August 26, 2010, when he stated, in relevant part:

> This letter is very "important"!  Today when I talk'd [sic] to you on the conference call I forgot to bring to your attention about my federal

habeas time concerning my 3.850 motion.  As you can see my mandate for my direct appeal was August 27, 2009.  I don't want to lose my federal habeas time, so could we please speed the process up on my 3.850 motion.

(ECF No. 40 at 18).

Shepard testified that although he could not recall when Chapalet first made him aware of the federal habeas deadline, he recalled that upon being made aware of it, he "stepped on the gas" and filed a "placeholder" Rule 3.850 motion prior to expiration of the federal deadline.

Additionally, although both Shepard and Chapalet testified that Chapalet told Shepard about the federal deadline in a telephone conversation, there is no specific, reliable evidence of when that conversation occurred.  Chapalet testified that he made Shepard aware of the federal deadline when he (Chapalet) found out about the deadline from prison law clerks and the law library (Tr. at 28).  However, Chapalet's testimony as to when this occurred was extremely vague.  He first stated, "Like 2009," and then stated, "I'm gonna say 2007 or -8." (*id.*).  Thus, the only reliable evidence of when Shepard became aware of a one-year federal deadline is the August 26, 2010 letter.

Shepard could not explain the reason for the delay between the date he found out about the federal deadline and October 12, 2010, the day he filed the Rule 3.850 motion.  But Shepard testified that he intentionally filed the Rule 3.850 motion prior

to expiration of the federal deadline.  Shepard testified that if he had been aware of the

federal deadline sooner, he would have filed the Rule 3.850 motion sooner.  Shepard

testified:

> Quite frankly, sir, if I had known about this federal habeas corpus, I
> would have kind of gone away from what I normally do and probably
> written a 3.850 so we could have filed it as soon as it came back from the
> DCA.  I didn't realize that this was a time limitation that was going to be
> detrimental to Mr. Chapalet.

(Tr. at 61).

The communication between Shepard and Chapalet (or lack thereof) during this

eight-month period from December of 2009 to August of 2010 must be viewed in the

context of their five-year attorney-client relationship (from June of 2007 to September

of 2012).  Attorney Shepard testified that during his representation of Chapalet, he had

"ample" communication with Chapalet (Tr. at 58).  He testified that although he did

not have as much contact with Chapalet during the period between the conclusion of

direct appeal and the commencement of the Rule 3.850 proceeding, he recalled having

"a lot" of communication with Chapalet during the course of his five-year

representation (*id.* at 58, 67).  Shepard explained that he communicated more with

Chapalet when a matter was pending or when Chapalet's participation was required,

such as preparing for the evidentiary hearing in the Rule 3.850 (*id.* at 67).

Chapalet acknowledged that Shepard visited him in person "a few times" while Chapalet was housed at Graceville Correctional Facility (from approximately September of 2009 to September of 2011). Chapalet also acknowledged that Shepard spoke with him on the telephone on numerous occasions throughout Shepard's representation. The parties' written communications reference telephone communications in February of 2008, October of 2009 (Shepard communicated with Chapalet's sister), December of 2009, August of 2010, September of 2010, December of 2010, December of 2011, and January of 2012. Additionally, the documentary record shows that Shepard wrote extensive letters to Chapalet in July of 2007 and August of 2008, explaining the scope of his representation and the means by which Shepard would accomplish Chapalet's objective of challenging his conviction. Also, Shepard kept Chapalet reasonably informed of the status of pending matters, including having his office send copies of pleadings filed in the direct appeal and the Rule 3.850 proceeding. There is no question that Chapalet was a prolific writer and would have liked more communication from Shepard, but a Florida lawyer's professional obligation with regard to communication is not dictated by the client—it is dictated by the Rules of Professional Conduct, which require reasonable communication. *See* Rules Regulating The Florida Bar, Ch. 4: Rules of Professional Conduct r. 4-1.4 Communication.

In the context of the scope of Shepard's representation, the status of those matters during the period October 16, 2009 to October 12, 2010 (i.e., the direct appeal had concluded, and the deadline for commencing the Rule 3.850 proceeding was not until August 27, 2011), and the ebb and flow of communication during Shepard's five-year representation of Chapalet, the undersigned concludes that Attorney Shepard's failure to communicate or respond to two of Chapalet's letters during the eight-month period between December of 2009 and late August of 2010, and Shepard's six-week delay in filing the Rule 3.850 motion (from late August to October 12, 2010) were at most negligent, but did not rise to the level of abandonment of the attorney-client relationship.  Therefore, Chapalet has not demonstrated the kind of extraordinary circumstance required to establish his entitlement to equitable toling. *See* Cadet, 742 F.3d at 481 (as a matter of law, attorney negligence, however gross or egregious, is not an extraordinary circumstance to warrant equitable tolling; "abandonment of the attorney-client relationship . . . is required.").

Moreover, Chapalet failed to demonstrate a causal connection between Shepard's lack of communication and Chapalet's late filing of the instant federal petition.  As of the date that Shepard filed the Rule 3.850 motion, 361 days of the federal limitations period had expired (October 16, 2009 to October 12, 2010). Chapalet testified that at the time the Rule 3.850 motion was filed, he knew he had

only four days remaining on his federal deadline.  Additionally, the record demonstrates that Chapalet was aware of all of his federal habeas claims on April 19, 2011, when Shepard filed the amended Rule 3.850 motion, which included the same eight claims that Chapalet asserts in his amended § 2254 petition (*see* ECF No. 32-1, Ex. G at 110–20; ECF No. 24 at 7–43)).  Over two years after that date, on September 9, 2013, it was evident that Chapalet would not receive relief on any of those claims in the state courts, because on that date the First DCA issued its per curiam affirmance of the circuit court's denial of the amended Rule 3.850 motion.  The state courts' rejection of his claims was reinforced on October 18, 2013, when the First DCA denied Chapalet's motion for rehearing.  Armed with knowledge that the state courts had rejected the claims that he intended to present in his § 2254 petition, and by making reasonably diligent efforts, Chapalet could have had the § 2254 petition already drafted and ready to file immediately after the First DCA issued the mandate on November 5, 2013.  Had Chapalet done so, his federal petition would have been timely.  Chapalet did not file his federal petition until May 2, 2014.

Instead of filing his federal petition, Chapalet attempted to re-litigate, in a Rule 3.800(a) motion filed on October 17, 2013, one of the claims that the state courts had already rejected in the Rule 3.850 proceeding (i.e., the issue raised as Ground Three in the Rule 3.850 motion).  Chapalet also pursued a frivolous attempt to seek review

of the First DCA's decision in the Rule 3.850 proceeding, by filing a "Notice of Appeal" in the Florida Supreme Court on October 25, 2013. The supreme court dismissed Chapalet's pleading on November 14, 2013, for lack of jurisdiction.

Additionally, upon the circuit court's dismissal of Chapalet's repititious Rule 3.800(a) motion on December 18, 2013 (the circuit court warned Chapalet that he may be sanctioned if he persisted in filing successive, repetitious motions (*see* ECF No. 32-3, Ex. R)), Chapalet still did not file his § 2254 petition. Instead, he filed nothing in either state or federal court until January 7, 2014, when he filed yet another Rule 3.800(a) motion, this time challenging not his conviction, but his HFO sentence on the ground that the state court could apply only one sentence enhancement (in fact, the court applied only one, the HFO enhancement). Chapalet was then somewhat out-of-pocket due to his participation as a witness in the federal criminal trial, but Chapalet was back at Florida State Prison on March 13, 2014 (*see* ECF No. 32-3 at 46). Even then, Chapalet did not file his § 2254 petition, and instead pursued an untimely appeal in the Rule 3.800 proceeding. Chapalet finally filed his federal habeas petition on May 2, 2014.

In sum, even if Shepard's failure to communicate with Chapalet from December of 2009 to late August of 2010, constituted abandonment, a finding which the undersigned does not make, Chapalet has not satisfied his burden of showing that the

alleged abandonment actually caused him to file a late § 2254 petition. Notwithstanding the alleged abandonment, Chapalet could have filed a timely § 2254 petition, preparing his § 2254 petition while awaiting the First DCA's mandate in the Rule 3.850, and then immediately filing it upon issuance of the mandate.  Instead, Chapalet chose to pursue repetitious and frivolous litigation in the state courts. Chapalet thus failed to demonstrate a causal connection between any conduct on the part of Attorney Shepard and Chapalet's untimely filing of his § 2254 petition.

IV.   CONCLUSION

Based upon the statutory tolling analysis set forth in the first Report and Recommendation, and the equitable tolling analysis set forth in this Second Report and Recommendation (based upon the record and evidence adduced at the evidentiary hearing), the undersigned concludes that Chapalet's § 2254 petition should be dismissed as untimely.[9]

V.   CERTIFICATE OF APPEALABILITY

---

[9] The undersigned previously determined that Chapalet was entitled to statutory tolling from October 12, 2010 (the date Shepard filed the Rule 3.850 motion) to February 27, 2014 (when the 30-day period for Chapalet to appeal the circuit court's January 27, 2014 order denying the second Rule 3.800(a) motion expired).  Even if the court permitted equitable tolling for the period that Chapalet participated in Mr. Taylor's federal trial, his § 2254 petition still would not be timely because Chapalet was back in an FDOC institution on March 13, 2014, but did not file his federal habeas petition until May 2, 2014.  The four days remaining on the federal clock expired during that period.

Rule 11(a) of the Rules Governing Section 2254 Cases provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." Rule 11(a), Rules Governing Section 2254 Cases.  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.  Rule 11(a) additionally provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Rule 11(a), Rules Governing Section 2254 Cases.  If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That Respondent's motion to dismiss (ECF No. 32) be **GRANTED**.

2.      That the amended habeas petition (ECF No. 24) be **DISMISSED** with

prejudice as untimely.

3.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this <u>15</u>th day of August 2016.


<u>/s/ Elizabeth M. Timothy</u>
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**